Grafton,
May 2, 1933.

ROGER S. WENTWORTH, *Adm'r*

*v.*

BOSTON & MAINE RAILROAD *& a.*

*Wentworth & Wakefield* (*Mr. Wentworth* orally), for the plaintiff.

*Theo S. Jewett* (by brief and orally), for the Boston & Maine Railroad.

*Stanton Owen* and *Thomas P. Cheney* (*Mr. Cheney* orally), for the Portland Contracting Company.

MARBLE, J. The Portland Contracting Company was engaged in constructing a highway in Holderness. Gravel for use in the work was hauled by trucks from a gravel pit located on the land of one Elliott in Plymouth. The road leading to the pit crossed the tracks of the defendant railroad at grade. The crossing was a private one, maintained for the accommodation of the Elliott farm. Permission to use the crossing was granted the contracting company by the railroad on condition that the company station a flagman there.

Austin S. Graton, Jr., the plaintiff's intestate, was the driver of one of the trucks. He was paid for his services by the owner of the truck, who furnished truck and driver for such work as the contracting company desired at a definite rate per hour. The work was described as "a kind of intermittent employment" as "all trucking is." The contracting company told Graton what work to do, but had no control over the actual operation of his truck.

On the morning of the accident, Graton reported to Ventresca, superintendent of the work, at Holderness, and was told by him to carry three laborers to the pit. On calling for these men, Graton found that they had already left in another truck. The evidence is conflicting as to whether he reported this fact to Ventresca. But whether he did or not, he started for the pit, and when he had reached the crossing was struck and killed by a north-bound passenger train. No flagman was on duty at the time.

The plaintiff claims that the railroad was at fault for not sounding a warning signal and for failing "to discover the presence of a dangerous situation." Since the crossing was a private one, the statutory signals were not required, and it was not the practice, as in *Quimby* v. *Railroad*, 79 N. H. 529, to whistle at that point. There was nothing in the ordinary use of the crossing which called for special protection, as in *Stocker* v. *Railroad*, 83 N. H. 401, 404, and *Morris* v. *Railroad*, 85 N. H. 265, 274. The added use occasioned by the work at the gravel pit was safeguarded by the terms of the contracting company's license. The company undertook to protect the crossing not as a delegated duty owed primarily by the railroad, but as a condition of that license.

The very fact that this condition was imposed indicated that the railroad assumed "no new obligation or duty" but that the contracting company must take its license "subject to the use of the road in the manner in which it was used at the time the license was granted." 3 Elliott, Railroads (3d *ed.*), s. 1788, *p.* 833.

The decedent's only right to use the crossing was by virtue of his relation to the contracting company, and the company's right was strictly limited to occasions when the company itself had provided a flagman. *Lavoie* v. *Company*, 79 N. H. 97, 98; *Devost* v. *Company*, 79 N. H. 411.

No right to recover under the last chance doctrine is claimed.

The court did not err in granting the defendant railroad's motion for a nonsuit.

So far as the operation of the truck was concerned, Graton was not the contracting company's servant. *Manock* v. *Company*, *ante*, 104.

The doctrine of assumed risk is therefore inapplicable. *Vidal* v. *Errol, ante,* 1. This does not mean, however, that Graton, while driving his truck on the company's business, was not entitled to rely upon the fact that the company had undertaken to protect the crossing for the benefit of its truck drivers. *Tullgren* v. *Company,* 82 N. H. 268. And the company, having assumed that duty, could not "carelessly abandon" it. *Hoyt* v. *Tilton,* 81 N. H. 477, 482, and cases cited.

Liability is denied, however, on the ground that Graton was not engaged in work for the company at the time of the accident. Ventresca testified that he told Graton he "had no work that morning for him."

But Ventresca's deposition had been taken, and he testified in regard to that deposition as follows: "Q. Well, now, Mr. Ventresca, I am referring now to Question 31 in your deposition; was this question asked you, and see if you made this answer. Question 31, 'What occasion was there for his going down to the Elliott pit?' Answer, 'You mean that day?' Question, 'That day.' Answer, 'To bring gravel over to the town and go on the job here and there. He didn't work steady; perhaps he would loaf for a couple of days, and then work a few days.' A. Yes, sir. Q. Were those questions asked you and did you make those answers? A. Well, that is it, yes. Q. Well, I say, did you? A. Yes. Q. That is correct, isn't it? A. Yes."

If there was any doubt as to what was meant by "that day" and the answer to the question, "That is correct, isn't it?" it was for the jury, who saw the witness on the stand, to resolve that doubt. There can be little question but that Ventresca was referring to the day of the accident, and it could be found that he ratified the portion of the deposition referred to by acknowledging its correctness, thereby making it "positive evidence of the contradicting facts." But even if the "effect of the deposition as evidence was merely to destroy the contradicted statement" (*Hobbs* v. *Company,* 75 N. H. 73, 74), there was still sufficient evidence to go to the jury on the question in controversy.

The gravel pit was on an isolated part of the Elliott farm. Apparently there was nothing except work for the company that would call Graton there. Gravel was being taken from the pit that morning, and Graton's truck was one of three trucks headed toward the pit when the accident occurred. Ventresca testified that Graton came back and told him that the three men were gone, and that he (Graton) then drove off in the direction of the pit. Under all the

circumstances, it was a reasonable inference that he went there at Ventresca's request to haul gravel.

The flagman usually stationed at the crossing was not present on the day of the accident. The company had dispensed with his services three days before. It does not conclusively appear that Graton knew that the crossing was unprotected. Ventresca testified that he did not inform him of that fact. Graton was apparently watching another truck, which he was following very closely. That truck crossed the track in safety. Under such conditions, it cannot be said as a matter of law that the decedent was guilty of contributory negligence.

*Exception sustained as to the Portland Contracting Co.*

*Judgment for the Boston & Maine Railroad.*

All concurred.